## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE EQUAL RIGHTS CENTER** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **Civil No. PJM 07-2357** |
| | * | |
| **CAMDEN PROPERTY TRUST, et al.** | * | |
| | * | |
| **Defendants** | * | |

## OPINION

Plaintiff Equal Rights Center (ERC), a non-profit civil rights organization located in Washington, D.C. that seeks, inter alia, to identify and challenge discriminatory architectural designs in housing and public facilities, has sued Defendants Camden Property Trust (CPT), a real estate investment trust organized under the laws of Texas that owns, develops, constructs and manages multifamily apartment communities throughout the country, and Camden Builders, Inc. (CBI), a Delaware corporation that provides contracting and building services and through which CPT conducts some of its business operations.   Defendants have filed a Motion to Dismiss or, Alternatively, for Summary Judgment.   Having considered the parties' arguments, the Court **DENIES** the Motion to Dismiss.[1]

---

[1]Although the Motion seeks Summary Judgment in the alternative, the Court finds that the issues before it are properly analyzable under the Motion to Dismiss and accordingly will proceed on that basis alone.  The Motion for Summary Judgment will therefore be DENIED WITHOUT PREJUDICE at this time, with the understanding that such a motion may yet be appropriate following the close of discovery.

1

I.

ERC represents the interests of 150 individual public members, most of whom are persons with disabilities.  After conducting on-site testing at 46 CPT multi-family properties around the country, including facilities located in this judicial district, ERC alleges that it became aware that a large number of new multi-family housing complexes constructed by CPT do not include the elements of accessible design, as required by law, rendering those properties inaccessible to individuals with disabilities.[2]  Following its testing, ERC examined Defendants' publications, including their website and Securities and Exchange Commission filings, and identified other of Defendants' properties possessing elements of design that ERC contends involve the same or similar violations.  ERC submits that it found design deficiencies with all 46 CPT properties it tested – in the States of California, Colorado, Florida, Georgia, Nevada, North Carolina, Texas, Virginia, and the District of Columbia, as well as Maryland.  ERC believes that approximately 80 other of Defendants' properties contain similar defects.  It claims that these deficiencies violate the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619 (FHA), and the Americans with Disabilities Act, 42 U.S.C. §§ 3601-3619 (ADA).  ERC also claims that, since all subject properties were constructed for occupancy or remodeled after January 26, 1993, they are subject to the prohibition of discrimination found in 42 U.S.C. § 12182(a) and the design and construction requirements of 42 U.S.C. § 12183(a)(1) of the ADA.  ERC alleges that these violations have been "continuing,

---

[2]ERC claims that the noncompliant elements of accessible design include: doors in units that are not sufficiently wide so as to allow passage into kitchens, bathrooms, bedrooms and other areas by persons using wheelchairs; bathrooms and kitchens with insufficiently clear floor space for persons in wheelchairs; and light switches, electrical outlets and thermostats that are not placed in accessible locations.

ongoing, and demonstrate a pervasive pattern and practice of systematic and continuous FHA and ADA violations over many years." It seeks injunctive and declaratory relief as well as damages and attorneys' fees.

Defendants have filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, pursuant to Fed. R. Civ. P. 12(b)(1), (2), (6) and 56, arguing that the Court lacks personal jurisdiction over them, that ERC lacks Article III standing to bring its claims, and that many of ERC's FHA "design and construct" claims are time-barred. The Court addresses these issues in turn.

II.

The Court first considers Defendants' argument that the Court lacks personal jurisdiction over them.

A.

Defendants argue that they are subject to neither general nor specific jurisdiction in Maryland. They further contend that they have had no contacts within Maryland related to ERC's claims that would satisfy the requirements for specific jurisdiction. Neither company, they say, played any role in the conduct underlying the Complaint, i.e. the design and construction of the Maryland subject properties.[3]

Defendants' principal argument with respect to general jurisdiction is that neither corporation has continuous and systematic contacts with this State. They point to CPT's status as a real estate investment trust organized under the laws of Texas and CBI's status as a Delaware corporation,

_____

[3]In support of these assertions, Defendants cite the Affidavit of CPT's and CBI's Senior Vice President of Finance and Chief Financial Officer, Dennis M. Steen.

suggesting that neither company owns property or conducts business in Maryland.  Further, according to Defendants, CPT's status as a corporate parent of separate entities that may own and operate the subject properties does not make it subject to the Court's jurisdiction.  They note that under Maryland law, a foreign corporation is not deemed to be "doing business within the state" for jurisdictional purposes "merely because of its subsidiary relationship to another corporation doing business in the state."  *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 873 (D. Md. 2000).

ERC argues that evidence of Defendants' contacts with and presence in Maryland appears on Defendants' website as well as in Securities and Exchange Commission (SEC) filings.  This evidence, says ERC, clearly establishes that Defendants are subject to both general and specific jurisdiction in this State.  For example, on its publicly accessible website, www.camdenliving.com, CPT indicates that it "owns and operates" over 175 properties "dispersed across the United States."  Six different properties located in Maryland are advertised as available.  The CPT website contains one or more pages about CBI, where CBI is described as a "wholly owned subsidiary" of CPT, providing expertise, inter alia, in real estate "ownership, development, and management," "acquisition, disposition, and redevelopment," and "consulting, building, and construction services" – all things that CPT purports to do.  The website, according to ERC, also provides a link to recent SEC filings and publications, including a 2006 Annual Report that advertises a Maryland property with the name "Camden Trace" as "Held for Sale."  ERC points out that in the same document, Defendants announce a "gain" of $4.7 million from "partial sales of land" in a College Park, Maryland joint venture, in which they assert that they have retained a 30 percent interest.  The Report also states that Defendants provided construction and development services to the joint

venture, a 508-apartment community, totaling $1.9 million for 2006.  Finally, ERC invites the

Court's attention to CPT's SEC Form 10-K, in which CPT identifies its "Operating Properties" as

including three "wholly owned" CPT properties in Maryland.[4]  Here, too, CBI is identified as a

"wholly-owned subsidiary of Camden . . . one of the largest real estate companies in the nation . .

. [which is] publicly traded on the New York Stock Exchange (NYSE) under the symbol CPT."

ERC thus argues that CPT, through entities such as CBI, conducts continuous and systematic

business, as well as very specific real estate operations, in Maryland and that the entities are subject

to both general and specific jurisdiction in this Court.

## B.

When a court's power to exercise personal jurisdiction over a nonresident defendant is

challenged by motion under Fed. R. Civ. P. 12(b)(2), "the jurisdictional question is to be resolved

by the judge, with the burden on the plaintiff ultimately to prove grounds of jurisdiction by a

preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d

390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)).

Where, as here, the court rules without conducting an evidentiary hearing, relying solely on the basis

of the complaint, affidavits and discovery materials, "the plaintiff need only make a prima facie

showing of personal jurisdiction."  *Carefirst of Md.*, 334 F. 3d at 396.  In determining whether the

plaintiff has proven a prima facie case of personal jurisdiction, the court "must draw all reasonable

inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan*

*Labs.*, 2 F.3d at 60.

---

[4]ERC notes that other Maryland properties are listed on Defendants' website as "under construction," and that in the Schedule III to Defendants' 2006 SEC Form 10-K, Defendants indicate that they took depreciation on the Maryland apartment properties.

C.

The Court agrees with ERC that the Court may exercise both general jurisdiction over Defendants and, insofar as any specific properties in this State may have challengeable design defects, specific jurisdiction as well.

"[F]or a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md.*, 334 F.3d at 396.  Because the limits of Maryland's long-arm statue for the exercise of personal jurisdiction are conterminous with the limits of the Due Process Clause of the United States Constitution, the statutory inquiry necessarily merges with the constitutional inquiry.  *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996).  The court's exercise of jurisdiction comports with due process if defendant has "minimum contacts" with Maryland such that requiring it to defend its interests in the state "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citation omitted).   General personal jurisdiction over a nonresident defendant exists if the defendant's activities in the state are "continuous and systematic." *Carefirst of Md.*, 334 F.3d at 397 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002)).  Specific jurisdiction exists if: "(1) . . . the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) . . . plaintiffs' claims arise out of those activities directed at the state; and (3) . . . the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* (citation omitted).

As ERC points out, CPT itself identifies several Maryland properties in its SEC Form 10-K, "wholly owned" properties as to which it has taken depreciation, an indication that CPT has availed itself of the privilege of conducting business activities within the State. Moreover, on CPT's website, www.camdenliving.com, CPT expressly holds itself out as doing business in Maryland. The website suggests that CPT "owns and operates" at least six properties in Maryland, ostensibly through CBI, while its Annual Report identifies the $4.7 million gain from a partial sale of land in the College Park joint venture. CPT also indicates that it received $1.9 million for design and construction services rendered in connection to the College Park endeavor, and $45 million in cash proceeds from the College Park land sales. All of these transactions would appear to have occurred with the active participation of CBI. The Court finds Defendants contacts with Maryland to be substantial, continuous and systematic, and fully sufficient to subject them to the general jurisdiction of the Court. Insofar as any of the Maryland buildings associated with CPT and CPI are alleged to have the accessible design deficiencies ERC complains of, both entities would also be subject to the specific jurisdiction of the Court.

III.

The Court next considers Defendants' argument that ERC lacks Article III standing to bring claims under the FHA and ADA.

A.

Defendants first argue that ERC lacks organizational standing because the facts it alleges do not reveal a causal link between the challenged conduct and the injuries that ERC and its members allegedly sustained. *See*, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding a court lacks subject matter jurisdiction under Article III unless plaintiff demonstrates that it has

suffered an "injury in fact" that is "fairly . . . trace[able] to the challenged action of the defendant") (citation omitted).  Specifically, Defendants contend that ERC's claim that it has been frustrated in pursuit of its overall mission in "identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services" does not suffice to establish organizational standing.  They argue that ERC's decisions to divert resources to investigate legal claims and pursue litigation do not constitute "injury in fact" for standing purposes; rather, say Defendants, these amount to no more than voluntary budgeting decisions that ERC has made on its own.  Defendants argue that the critical inquiry for standing purposes under the FHA is whether a defendant's actions have "perceptibly impaired" the organization's ordinary activities.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  ERC's "generalized awareness that there may be violations of the law" at Defendants' properties, say Defendants, is, without more, too vague to constitute injury in fact for standing purposes.

Defendants continue: Even if ERC could establish standing with respect to some of the properties named in the Complaint, it cannot demonstrate standing as to properties outside ERC's named service area of Washington, D.C.  Defendants note that ERC describes itself as serving disabled individuals in the Washington, D.C. area and thus argue that ERC cannot be harmed by any design and construction defects that might be found in buildings in Arizona, California, Colorado, Florida, Georgia, Kentucky, Missouri, Nevada, North Carolina, Pennsylvania or Texas.  Moreover, as to the 80 or so properties that ERC has listed in the Complaint, but has not visited, Defendants

argue that ERC cannot connect the alleged design and construction defects of these properties to an injury ERC has suffered.[5]

ERC responds that it has both organizational and representational (also known as "associational") standing.  In other words, it claims damages to itself, as recognized in *Havens*, and also on behalf of its members.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).   The Supreme Court has made clear, it says, that Article III standing is available to organizations, such as ERC, that bring claims under the FHA.  *See Havens*, 455 U.S. at 378-79 (holding that allegation that defendant's activities had caused plaintiff non-profit corporation to divert resources for organization's counseling and referral services was sufficient for Article III standing purposes for claims brought under the FHA).  ERC submits that it did indeed suffer injury in fact within the meaning of the FHA when Defendants' actions caused it to divert resources to investigate, test, and counteract Defendants' perceived discriminatory conduct.   Such injuries, says ERC, are of a piece with the types of injuries that *Havens* and its progeny have held sufficient for Article III standing for organizations.   ERC also challenges the argument that because ERC's principal place of business is Washington, D.C., it lacks standing to assert FHA violations at properties outside the area, citing a decision from this District, *Equal Rights Ctr. v. Equity Residential, et al.*, 483 F. Supp. 2d 482 (D. Md. 2007) , in which Judge Andre M. Davis of this Court held that the fact that ERC had undertaken a national investigation was sufficient to allege a cognizable injury outside of Washington, D.C.  ERC contends that nothing in its Complaint suggests

---

[5]Defendants also argue that ERC has no representational standing to sue on behalf of its members.  The claim that an unknown number of members have been injured, with no specific description of the nature of the injury to any members, is allegedly insufficient to establish standing.  *See*, *e.g.*, *ACLU v. NSA*, 493 F.3d 644, 673-74 (6th Cir. 2007).

that its mission and activities are focused solely within the D.C. metropolitan area.  It argues that whether all the properties it complains of have been visited or tested is legally irrelevant to the issue of standing.[6]

B.

There are two ways to present a Rule 12(b)(1) motion to dismiss.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  A defendant may either contend (1) that the complaint fails to allege facts upon which subject matter jurisdiction can be based, or (2) that the jurisdictional facts alleged in the complaint are untrue.  *Id.*  If, as in the case now before the Court, a defendant raises the first argument, then the allegations in the complaint are assumed to be true and the court will view the motion as it would one brought under 12(b)(6), *id.*, which motion "tests the sufficiency of a complaint."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

"For purposes of ruling on a motion to dismiss for want of standing, [the court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Pacific Legal Found. v. Goyan*, 664 F.2d 1221, 1223 (4th Cir. 1981) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

To establish Article III standing, a plaintiff must allege facts which demonstrate: (1) the existence of a "concrete and particularized" injury-in-fact; (2) "a causal connection between the injury and the conduct complained of"; and (3) that a favorable adjudication would likely redress the alleged injury.  *Lujan*, 504 U.S. at 560-61.  An organization may establish standing under two theories: either (a) standing in its own right, or organizational standing, or (b) representational, also

---

[6]ERC also submits that it meets the requirements for representational standing.

known as "associational," standing based on the fact that members it represents have been harmed. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991).

C.

The Court finds that ERC has alleged sufficient facts to support organizational standing in this case.[7]

Organizational standing under the FHA exists to the extent of constitutional "case or controversy" limits; prudential considerations play no role.  *Havens*, 455 U.S. at 379. As the Supreme Court stated in *Havens*: "If, as broadly alleged, petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities - with the consequent drain on the organization's resources - constitutes far more than simply a setback to the organization's abstract social interests . . ." *Id.* at 379.  Thus, to allege a redressable injury-in-fact caused by defendants under the FHA, a plaintiff need only allege facts that demonstrate that the defendants' actions either caused the organization to divert resources to identify and counteract the defendants' unlawful practices, or that the challenged actions have frustrated plaintiff's mission. *Id.* at 369, 378-79.  Moreover, in allowing suits by "aggrieved person[s]" under Section 3613 of the FHA, Congress evidenced an intent to define standing for purposes of the Act as broadly as is permitted by Article III, thereby depriving courts of the authority "to create prudential barriers to standing" in FHA suits.  *Id.* at 372.

---

[7]Because the Court finds that ERC has adequately established organizational standing, it need not address the parties' representational standing arguments.

In this case, ERC submits that it has had to divert resources to investigate, test, and counteract what it says is extensive discriminatory conduct on the part of Defendants.  It argues that because of the forced diversion of resources, it has been frustrated in its mission of identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, counseling, testing, enforcement and advocacy.

The Court agrees.  The injuries claimed by ERC are precisely the types of injuries that *Havens* and its progeny have held sufficient for Article III standing.  As Judge Davis of this Court said in *Equity Residential*, *supra* p.9, "the very fact that plaintiff undertook a nationwide investigation of defendants' violations is proof positive of plaintiff's concrete injury; the resources devoted to the two-year investigation were clearly 'diverted.' Nothing more is required." 483 F. Supp. 2d at 487.  Other cases from this District and from other circuits have reached a similar conclusion.  *See*, *e.g.*, *Williams v. Poretsky Mgmt.,Inc.*, 955 F. Supp. 490, 494 (D. Md. 1996) (holding that the plaintiff met organizational standing requirements by alleging that it had "devoted significant resources to identifying and counteracting the defendant's practices, and because time was spent on these efforts, the organization was prevented from spending time on other efforts to end discrimination in the housing area"); *see also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (devotion and deflection of significant resources to identify and combat defendants' alleged conduct, including preparation of the lawsuit itself, is sufficient basis for standing); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (same); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (same); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990).

Beyond this, the Court is unpersuaded by Defendants' arguments that ERC lacks standing to sue for relief for housing violations outside the Washington, D.C. area and that ERC cannot demonstrate injury-in-fact as a result of alleged violations at the 80 properties it has not yet visited. As Judge Davis of this Court noted in *Equity Residential*, ERC is an "organization with a mission that is national in scope and breadth," consequently rejecting defendants' argument that ERC could not have standing as a matter of law outside the greater Washington area.  483 F. Supp. 2d at 487. Nothing in the Complaint in this case suggests that ERC's mission and activities are focused solely within the District of Columbia metropolitan area.

ERC has also alleged facts sufficient to demonstrate injury-in-fact as to those properties not yet visited.  *See* Hr'g Tr. at 50-51, *Equal Rights Ctr. v. Archstone Smith Trust, et al.*, No. AMD-04-3975 (D. Md. Nov. 17, 2005) (Davis, J.); *Equity Residential*, 483 F. Supp. at 487; *see also Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 499-500 (E.D. Va. 2002).  As Judge Davis has noted, because "the tested properties share various combinations of common design elements with the untested properties, plaintiff may permissibly and reasonably allege on 'information and belief' the existence of violations at each of the properties named in the complaint." *Equity Residential*, 483 F. Supp. 2d at 487.  The same is true here.  ERC has alleged that it tested over 30 percent of the subject properties and that it discovered FHA and/or ADA violations at every property tested.  It also undertook efforts to ascertain violations at untested properties, including expending considerable staff time and resources reviewing published floor plans and composing a detailed analysis of tested to untested units.  The composite of these allegations meets the *Havens* threshold for establishing ERC's standing under the FHA.

13

D.

On statutory and prudential grounds,[8] Defendants also attack ERC's standing for purposes of the ADA. They argue that regardless of whether ERC meets the FHA's standing requirements, it may not pursue claims under the ADA unless it shows that it personally has been "subjected to discrimination" or that it has "reasonable grounds for believing that [it] is about to be subjected to discrimination." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 208 (D.N.J. 2003). Defendants point out that although Congress made clear that standing under the FHA extends "to the full limits of Article III," *Havens*, 455 U.S. at 372, Title III of the ADA contains no parallel expression of Congressional intent that would modify or abrogate prudential standing requirements; therefore stricter standing requirements must apply.

The Court agrees with ERC that it has standing to sue under the ADA. ERC reprises the injury-in-fact argument it makes in connection with its FHA claim, a proposition the Court has already endorsed.[9] The Court also agrees with ERC that rejection of prudential standing requirements is consistent with the legislative history and purpose of the Act. The ADA, including Title III, was modeled after other civil rights statutes where prudential standing limitations do not apply. *See* 42 U.S.C. §§ 12117, 12132, 12188 (enforcement of ADA is to be analogous to other

---

[8]Even when Article III requirements are met, "a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979).

[9]Defendants request jurisdictional discovery on the issue of whether ERC or its members have suffered injury in fact for Article III standing purposes. As previously explained in the text, the Court finds that ERC has adequately pled injury in fact for standing purposes. Discovery on the matter is therefore unnecessary.

14

remedies and procedures in other civil rights acts); *see also* H.R. Rep. No. 485, pt. 3, at 66 (1990).

At least two Courts of Appeal have considered standing under Titles I and II of the ADA and have

found that prudential limitations on standing do not apply. *See MX Group, Inc. v. City of Covington*,

293 F.3d 326, 335 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37,

47-48 (2d Cir. 1997), superseded on other grounds, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171

n.7 (2d Cir. 2001). District courts that have considered the matter of standing for claims brought

under Title III of the ADA have also applied the *Havens* standard and have declined to restrict ADA

claims by adding prudential limits on standing. *See Indep. Living Res. v. Or. Arena Corp.*, 982 F.

Supp. 698, 760-61 (D. Or. 1997); *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 769-72

(E.D. Va. 2003) (finding no standing but using a *Havens* analysis).

Judge Davis summed up the relevant policy considerations in *Equity Residential*: "[I]t would

be an absurdity of extraordinary proportions if, in this nationwide pattern and practice lawsuit

seeking to vindicate the equal access rights of persons with disabilities, ERC were permitted to seek

injunctive and declaratory relief which, if it were successful, would make it possible for persons with

disabilities to live in otherwise nonconforming apartment units, while at the same time, as a result

of a lack of plaintiff's standing under the ADA, persons with disabilities obtained *no access or

limited access* to parking lots or leasing offices (public accommodations) at those very multi-family

buildings." 483 F. Supp. 2d at 487 n.7.

The Court concludes that ERC has established that it has standing to sue under the ADA.

IV.

The Court considers next Defendants' argument that ERC's claims regarding certain of the

challenged properties are barred by the FHA's statute of limitations.

15

A.

Defendants contend that the FHA's two-year statute of limitations, 42 U.S.C. § 3613(a)(1)(A), bars claims with respect to many of the subject properties. They argue that the "continuing violations" theory, which provides that a plaintiff may recover for a string of incidents that form a single action even if some of those incidents occurred outside the limitations period, should not apply to an FHA claim involving a series of separately identifiable and actionable actions, such as failure to design and construct a building consistent with FHA requirements. In support of this proposition, they cite several recent Supreme Court cases in the employment discrimination context. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002) (holding that continuing violations theory applied to plaintiff's hostile work environment claim but not to the discrete, separately actionable claims of employment discrimination, such as termination, failure to promote, or denial of transfer, all of which must be brought within the applicable statute of limitations period); *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2175 (2007) (in the context of a Title VII pay discrimination claim, holding that discrete acts, even if they occur as serial violations, are different than continuing violations because they are each "independently identifiable and actionable"). Because, in this case, ERC's design and construction claims against Defendants constitute "discrete acts," Defendants argue, that those claims must have been brought within two years of the date the buildings were completed. Defendants submit that at least 106 subject properties in this suit were completed in their entirety prior to September 6, 2005. Accordingly, because ERC filed suit in this case on September 6, 2007, Defendants submit that ERC's FHA claims regarding those properties are time-barred.

Defendants cite several cases to the effect that the discriminatory practice in connection with design and construction claims that triggers the two-year statute of limitation period is the construction of each property, "which concludes on the date that the last certificate of occupancy is issued." *Garcia v. Brockway*, 526 F.3d 456, 466 (9th Cir. 2008) (en banc).  In *Garcia,* the Ninth Circuit held that plaintiffs had confused "a continuing violation with the continuing effects of a past violation" and noted that "[a]lthough the ill effects of a failure to properly design and construct may continue to be felt decades after construction is complete, failing to design and construct is a single instance of unlawful conduct." *Id.* at 462-63.[10]  In the same vein, Defendants argue that the alleged violations of which ERC complains in this suit constitute the continuing effects of a past violation rather than continuing violations and that the continuing existence of noncompliant properties does not toll the statute of limitations.  *See Moseke*, 202 F. Supp. 2d at 507 (noting that "a FHA non-compliant building which contains inaccessible features to disabled persons is more akin to a continuing effect rather than a continuing violation under the FHA" and holding that plaintiffs' design and construction claim was time barred); *Kuchmas v. Towson Univ., et al.*, No. RDB 06-3281, 2007 U.S. Dist. LEXIS 66689, at *17 (D. Md. Sept. 10, 2007) (holding, in suit against defendant architects, that statute of limitations was triggered, "at the latest," when property was fully constructed).  To apply the continuing violation doctrine to design and construction cases would effectively eliminate the statute of limitations, according to Defendants, because a developer could remain liable under Section 3604(f)(3)(c) decades after the completion of construction, regardless of whether the developer still owned the property.

---

[10] Because the construction of properties in that case had been completed more than two years prior to plaintiffs bringing suit, the court held that plaintiffs' "failure to design and construct" claims were barred under the statute of limitations.  *Id.* at 466.

Finally, Defendants argue that ERC should not be able to recover for discrete violations that occurred outside the two-year statute of limitations by asserting that Defendants are repeat offenders of the FHA, even if the frequency and similarity of these violations demonstrate that Defendants engaged in a pervasive pattern and practice of discrimination. *See Morgan*, 536 U.S. at 105 (rejecting the notion that the "continuing violations" theory applies to "serial violations," even where the claims "are 'sufficiently related' to incidents that fall within the statutory period"). Private parties, say Defendants, may not bring a cause of action based on "pattern or practice" claims of discrimination. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759-61 (4th Cir. 1998) (in an employment discrimination case, holding that plaintiffs did not have a private pattern or practice cause of action), vacated on other grounds, 527 U.S. 1031 (1999). Because the FHA authorizes the Attorney General, and not private groups or persons, to commence a civil action where he "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights" set forth in the FHA, Defendants contend that ERC cannot bring claims based on an alleged pattern or practice. *See* 42 U.S.C. § 3614.

ERC maintains that the continuing violation doctrine applies to the design and construction claims it brings under the FHA.[11] It argues that Defendants' reliance on *Morgan* and *Ledbetter* is inapposite, since those cases dealt with continuing violation claims in the Title VII context and not that of the FHA, where ERC asserts that both Congress and the Supreme Court have indicated their

---

[11]ERC also submits that a number of the challenged properties were designed or constructed within two years prior to initiation of this lawsuit and that as long as it has alleged that some of the discriminatory conduct occurred within limitations, it can obtain relief for prior violations on the properties evidencing the same conduct.

approval of the continuing violation theory.  ERC relies principally on *Havens*, *supra* p.8, where plaintiffs brought claims under the FHA alleging racial steering on the part of an apartment complex and its employees.  There, says ERC, the Supreme Court expressly held that the "continuing violation" doctrine applies to FHA claims for statute of limitation purposes: "[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed [within the statute of limitations period after the] last asserted occurrence of that practice." 455 U.S. at 380-81.

ERC also argues that application of the continuing violation theory to claims brought under the FHA is supported both by the plain language of the statute and Congressional intent.  It notes that in 1988, when Congress amended the FHA to include the provisions at issue here, it added language to clarify that a party can bring a claim within two years after the cessation of any ongoing discriminatory housing practice in order to bring the FHA in line with the *Havens* application of the continuing violations doctrine.  *See* H.R. Rep. No. 100-711, at 33 (limitations period runs "from the time the alleged discrimination occurred or terminated").  Congress explained that the reason for the amendment was to include the word "termination," which was "intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice." *Id.* at 33, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2194 (citing *Havens*, 455 U.S. at 380-81).

Finally, ERC argues that recent decisions in this district support a reading of the FHA that allows for application of the continuing violation theory to design and construction claims.  It cites *Balt. Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700 (D. Md. 1999), where the

court held that the continuing violations theory was applicable in an FHA suit brought against a builder who claimed, as Defendants do here, that some of the units in the complex were built for occupancy more than two years prior to the action.  Judge Black held that "the limitations period [did] not begin to run until the happening of the 'last asserted occurrence' of discrimination,'" which in that case was the sale of the last unit, i.e., when the owners and managers ceased to have control over the individual units.  *Id.* at 710.  ERC also cites an oral opinion of Judge Davis in *Archstone*, *supra* p.13, in which he held that "the continuing violation theory recognized in *Havens* does and should apply" to design and construction claims brought under the FHA.  Hr'g Tr. at 65.  In addition, in *Equal Rights Ctr. v. Lion Gables Residential Trust, et al.*, No. DKC 07-cv-2358 (D. Md. Aug. 13, 2008), Judge Chasanow of this Court held that "the mere fact that a property was completed more than two years prior to the filing of the FHA claim does not automatically bar suit" and upheld the application of the continuing violation theory to FHA design and construction claims. Op. at 13.  Judge Chasanow reasoned that the legislative history of the FHA, along with the differences in language between the FHA and Title VII, establish a distinction between continuing violation claims brought under the two Acts.  *Id.* at 11-13.

B.

While not insensitive or unsympathetic to Defendants' arguments on the matter of limitations, the Court believes that ERC's arguments also have merit.  Although this issue presents a close question, the Court is inclined to follow the recent decisions of colleagues who have upheld the application of the continuing violation theory to design and construction claims under the FHA.

Accordingly, the Court holds that ERC's claims as to properties are not barred by the two-year statute of limitations.[12]

V.

The parties raise other issues that the Court finds warrant further discovery and which are more properly the subject of dispositive motions at a later stage in the proceedings.

First, Defendants argue that ERC's FHA claims regarding properties constructed prior to March 13, 1991, the effective date of the FHA, must be dismissed.[13]  Defendants submit that at least one such property was not completed prior to that date.  Second, Defendants argue that construction on nine properties had not yet been completed when the Complaint was filed and that those properties were not open for inspection or occupancy.  Defendants thus submit that claims regarding those properties should be dismissed.  ERC opposes both requests, noting that a motion to dismiss should not be converted to a motion for summary judgment "when the nonmoving party has not had the opportunity to discover information essential to [the] opposition." *McLaughlin v. Murphy*, 372 F. Supp. 2d 465, 470 (D. Md. 2004). The Court agrees with ERC and will deny Defendants' motion on those issues without prejudice.

---

[12]The Court acknowledges that other circuits, including the Ninth Circuit in *Garcia*, *supra* p.17, have taken a contrary view.  526 F.3d at 462-63 (holding that continuing violation theory does not apply to FHA design and construction claims in light of *Ledbetter*); *cf. Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 Fed. Appx. 469, 481 (6th Cir. 2006) (holding that "in cases where the plaintiff alleges that the owner of a multi-family housing development failed to design and construct the development so as to make it accessible to disables individuals, the limitations period will depend on the specific circumstances of each case").

[13]The FHA applies its accessibility requirements only to multifamily dwellings constructed for first occupancy "30 months after" the date of the Fair Housing Amendments Act of 1988. 42 U.S.C. § 3604(f)(3)(C). Because the FHAA was enacted on Sept. 13, 1988, the effective date for FHA design and construction claims is March 13, 1991.

Defendants also request that the Court dismiss ERC's claims for retrofitting,[14] arguing that such relief would impose an onerous financial and logistical burden on Defendants out of proportion to ERC's claimed injuries.   The Court believes it is too early in the proceeding to determine the appropriateness and availability of the requested relief.    Defendants' Motion to Dismiss in this regard will also be denied without prejudice.

VI.

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.  Defendants' Motion for Summary Judgment is **DENIED WITHOUT PREJUDICE**.

A separate order will ISSUE.


_____ /s/ _____
**PETER J. MESSITTE**
**September 22, 2008**              **UNITED STATES DISTRICT JUDGE**

---

[14] ERC seeks full compensation for whatever detrimental effects Defendants' noncompliance with the various anti-discrimination laws may have had with respect to ERC's diverted activities as well as a comprehensive injunction ordering that all 126 of Defendants' properties at issue in this case be retrofitted so as to come into compliance with the requirements of the FHA and ADA.